FILED

'08 DEC 19 PM 3: 26

U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

**United States District Court
Middle District of Florida
Orlando Division**

Leonardo Del Valle-Mejia,

vs.

Walter A. McNeil,
Secretary Department of Corrections

_____/

## Petitioners Memorandum of Law in Support of Petition Filed Under 28 U.S.C. § 2254

Comes now, undersigned counsel, as habeas counsel for Leonardo Del Valle-Mejia, and files this his Memorandum of Law in Support of Petition filed under 28 U.S.C. § 2254.

### STATEMENT OF THE CASE AND FACTS

This matter came before the Ninth Judicial Circuit in Orange County, Florida for consideration of the Petitioner, Leonardo Del Valle-Mejia's motion for post-conviction relief, pursuant to Florida Rule of Criminal Procedure 3.850. The Lower Court concluded that summary denial of the Appellant's post-conviction motion was warranted. The Fifth District Court per curiam affirmed the decision without opinion.

1. <u>Course of Proceedings and Disposition in the Circuit Court</u>

The Appellant, Leonardo Del Valle-Mejia, was charged by Information with Conspiracy to Trafficking in Heroin, Trafficking in Heroin (28 grams or more), and Tampering with Physical Evidence on April 16th, 2003. He was found guilty by jury trial of trafficking in heroin on April 2, 2004 and was subsequently sentenced on May 25, 2004 to a term of thirty years imprisonment. The Appellant was acquitted of Conspiracy to Traffic in Heroin and Tampering with Physical Evidence. The Fifth

1

District Court of Appeal per curiam affirmed without opinion, Del Valle-Mejia v. State, 895 So.2d 1084 (Fla. 5th DCA 2005).

2. Statement of Facts

On the first day of his trial, the Appellant appeared in Orange County jail blues. However, the Appellant was not asked whether he wished to stay in this attire when in fact, he did not want to wear his prison clothes during the trial.  The jury could easily recognize that the Appellant was wearing prison clothes because Luis Pareja, a witness for the State, later identified him by saying, ""He's seated in front of me with the jail uniform." (see attached exhibit A). Defense counsel explained to the Court that he attempted to find suitable clothing for the defendant, but was unsuccessful. "He [the defendant] begged to get a shave yesterday.  He didn't get a shave....I asked about the clothes.  They [the guards] said no problem; he'll be in sweat pants and a shirt." Id. The Appellant was forced to not only attend his trial in jailhouse blues, but also in shackles, and unshaven.

The Court responded, "If you had brought it to my attention I could have helped you.  They have clothes at the Public Defender's office. Id.  Near the end of the trial, the Court again addressed the issue of the defendant's appearance and whether defense counsel wanted him to change. (see attached Exhibit B). Defense counsel responded, "He's already been in his blues the last two days.  I don't see the difference at this point, but I did try to make an effort to get him clothing." Id. Defense counsel stated that he did not have an objection to the defendant's appearance at this point in the proceedings. Id.

Juan Sanchez, the state's central witness is the case, testified that he had only

2

sold heroin for a couple of months and that the defendant was his only supplier of heroin. (see attached Exhibit C and D). The Appellant's trial attorney did not call any witnesses on his behalf to dispute these facts, despite the availability of two defense witnesses who could have impeached Sanchez, changing the outcome of the trial. When a search warrant was executed at Sanchez's residence, the Appellant, not Sanchez was present in the home and was arrested. The search team recovered a shoebox from the kitchen counter.  The shoebox contained blue plastic bags, which contained heroin wrapped in latex. There was no attempt to recover fingerprints from the items There was no physical evidence indicating the Appellant had any involvement with these items. At trial, Sanchez identified the box as "my Nike box." The only evidence linking the Appellant to the heroin was the testimony of Sanchez.

### 3. Post Conviction Proceedings

The Appellant's motion alleged ineffective assistance of counsel on three separate grounds, first, trial counsel's failure to object to his presence in front of the jury in identifiable prison clothes, second, trial counsel's failure to object during the prosecutor's improper closing argument that appealed to racial prejudice, and third, trial counsel's failure to investigate and call exculpatory witnesses at trial.  The trial court summarily denied all claims without attaching any portion of the record conclusively refuting the arguments presented.

The Lower Court addressed the Appellant's claim of ineffective assistance of counsel for failure to object to the Appellant's clothing in front of the jury, noting the record "does not reflect that the appellant knowingly waived his right to appear in non-prison clothing." (see attached Exhibit E).  The lower court also stated that it was not

3

persuaded by the State's argument that counsel's strategy was apparent from the face of the record, explaining that "it is rarely appropriate to make a finding of trial strategy without an evidentiary hearing." Id. Nevertheless, the lower court held that it was not necessary to reach a conclusion regarding counsel's strategy because the defendant, in the lower court's own opinion, was not prejudiced by standing trial in jail clothing because he was acquitted of two of the three counts with which he was charged at trial.

The lower court denied the defendant's argument that he received ineffective assistance when counsel failed to investigate and call exculpatory witnesses at trial. The Court concluded that the two witnesses' testimony "would have amounted to impeachment on a minor issue and would not have led the jury to discredit Sanchez's testimony." Id. The lower court summarily denied all grounds and therefore, an evidentiary hearing was not held. A timely notice of appeal was filed.

The Fifth District Court of Appeal per curiam affirmed the lower court's decision, without a written opinion, despite the fact that the lower court's order was in direct conflict with the Fourth District Court of Appeal. Defense counsel had also filed a motion for oral arguments, which was not ruled upon by the Fifth District. The Petitioner filed a motion for rehearing asking for an opinion so that he could file his action with the Florida Supreme Court, which was also denied without opinion. This habeas petition follows.

ISSUES AND SUPPORTING ARGUMENT TOGETHER WITH POINTS AND

AUTHORITIES OF LAW

I. **THE DENIAL OF VALLE MEJIA'S POSTCONVICTION MOTION AND SUBSEQUENT APPEAL WAS CONTRARY TO ESTABLISHED FEDERAL LAW BECAUSE HE WAS COMPELLED TO STAND TRIAL IN HIS PRISON CLOTHES.**

Valle Mejia's due process rights were violated when he was compelled to stand trial in prison clothing. The Ninth Circuit and Fifth District Court's denial of relief of this claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C § 2254(d)(1) (2008). Neither the record nor the trial transcripts indicate that the defendant knowingly waived his right to appear in non-prison attire. The defendant was in fact compelled to wear prison clothes and shackles throughout his entire trial, serving as a constant reminder to the jury of his status as a prisoner. This constitutes a fundamental violation of his right to a fair trial, a liberty secured by the Constitution.

Issues raised in a federal habeas corpus petition must have been reasonably presented to the state courts and as a result, exhausted.    Hutchins v. Wainwright, 715 F.2d 512 (11th Cir. 1983).  Exhaustion mandates that an issue be pursued in the state courts through the appellate process.  Leonard v. Wainwright, 601 F.2d 807 (5 Cir. 1979).  Both the factual matter of a claim and the federal constitutional issue must be presented to the state courts to attain exhaustion for purposes of federal habeas corpus review.  Baldwin v. Reese, 541 U.S. 27 (2004); Gray v. Nerherlands, 518 U.S. 152 (1996); Duncan v. Henry, 513 U.S. 364 (1995); Picardy v. Connor, 404 U.S. 270 (1971).

In Florida, exhaustion may be accomplished by the filing of a 3.850 motion and an appeal from its denial. Leonard 601 F.2d at 808.

The Petitioner has exhausted his issues in state court and is now seeking relief in the Federal system. His 3.850 motion was summarily denied by the Ninth circuit, which held that Valle-Mejia was not prejudiced when he was forced to wear identifiable prison clothing, shackles and appearing before the jury unshaven because he was acquitted of two of the three counts he was charged at trial. (see attached Exhibit E). This decision was per curiam affirmed on appeal without opinion. The test used by the circuit court was improper. "Before a federal constitutional error can be held harmless the court must be able to declare a belief it was harmless beyond a reasonable doubt." Hernandez v. Beto, 443 F.2d 634, 637 (5th Cir. 1971) (holding that trying a petitioner in his prison clothing infringed a fundamental right, the presumption of innocence). The impact on the jury of Valle-Mejia's appearance made it impossible for the court to declare this was harmless error beyond a reasonable doubt. This reasoning by the Ninth Circuit, which was affirmed by the Fifth District, is contrary to the holding of the United States Supreme Court Estelle v. Williams, 425 U.S. 501, 503, 96 S.Ct. 1661, 1692, 48 L.Ed.2d 126 (1976). The Supreme Court in Estelle stated:

> The actual impact of a particular practice on the judgment of jurors cannot always fully be determined. But this Court has left no doubt that the probability of deleterious effects on fundamental rights calls for close judicial scrutiny…The potential effects of presenting an accused before the jury in prison attire need not, however, be measured in the abstract. Courts have with few exceptions, determined that an accused should not be compelled to go to trial in prison or jail clothing because of the possible impairment of the presumption so basic to the adversary system.

Valle-Mejia appealed the denial of his 3.850 claim, which was per curiam affirmed without opinion. The state's continual denial of his claim was contrary to established Federal law and is direct conflict with the Fourth District Court of Florida.[1]

Under 28 U.S.C. §2254(d), Federal habeas courts review state court decisions by determining whether the decision was " contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." "Clearly established Federal law" refers to the holdings of the United States Supreme Court in effect at the time of the state court decision. Putnam v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001). A state court's decision is "contrary to" clearly established Federal law if it applied a rule that conflicts with a United States Supreme Court decision when examining materially similar facts. Id. see also Fugate v. Head, 261 F.3d 1206, 1215-16 (11th Cir. 2001). A state court decision involves "an unreasonable application of clearly established federal law" if it unreasonably applies a correct legal principle for a Supreme Court case to the facts of a petitioner's case or "unreasonable extends or declines to extend a legal principle from Supreme Court case law to a new context." Putnam 268 F.3d at 1241; see also Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

In the present case, the Florida State Courts have misconstrued the holding of the United States Supreme Court and have also have unreasonably applied well-established Federal and State law. A presumption of innocence in favor of the defendant is a basic element of a fair trial in our system of justice. Estelle v. Williams, 425 U.S. 501, 503, 96 S.Ct. 1661, 1692, 48 L.Ed.2d 126 (1976). This presumption of

---

[1] See Lewis v. State, 864 So.2d 1211 (Fla. 4th DCA 2004); Palmer v. State, 831 So.2d 725 (Fla. 4th DCA 2002); Pineda v. State, 805 So.2d 116 (Fla. 4th DCA 2002).

innocence is impaired and a defendant's right to a fair trial is violated when compelled to stand trial in prison garb. Id, at 504, 96 S.Ct. at 1693, 48 L.Ed.2d 126. See United States v. Harris, 703 F.2d 508, 509-11. In Estelle, 425 U.S. at 513, 96 S.Ct. at 1697, the Supreme Court held "the State cannot, consistently with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothes."

> This is recognition that the constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment. The defendant's clothing is so likely to be a continuing influence throughout the trial that, not unlike placing a jury in the custody of deputy sheriffs who were also witnesses for the prosecution, an unacceptable risk presented of impermissible factors coming into play. Id at 425 U.S. at 505, 96 S. Ct. at 1693. Citing Turner v. Louisia, 379 U.S. 466, 473, 85 S.Ct. 546, 550, 13 L.Ed.2d 424, 429 (1965).

The petitioner was the only person throughout the trial wearing prison garb and shackles. He also requested a shave, which was not granted; therefore, he appeared before the jury unshaven. This impaired the judgment of the jury and impinged on his constitutional right to a fair trial. The Court clearly ignored this holding when it denied the Petitioner's 3.850 motion.

In Holbrook v. Flynn, 475 U.S. 560, 568, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986), the United States Supreme Court noted that shackling is "inherently prejudicial." The practice of shackling, like wearing prison clothes during a trial, will often have negative effects that 'cannot be shown from a trial transcript." Deck v. Missouri, 544 U.S. 622, 635 125 S.Ct. 2007, 2015, 161 L.Ed.2d 953 (2005) citing Riggins v. Nevada, 504 U.S. 127, 137, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992). When a court, without adequate justification, allows the accused to appear before the jury wearing shackles, "the defendant need not demonstrate actual prejudice to make out a due process violation.

8

The State must prove 'beyond a reasonable doubt that the shackling error complained of did not contribute to the verdict obtained'." Deck, 544 U.S. at 635; citing Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).  The state court's decision in Valle-Mejia's 3.850 motion and subsequent appeal was therefore not only contrary to established federal law set out in Estelle, but was also contrary to the United States Supreme Court decision in Deck v. Missouri.  The Petitioner was not required to demonstrate actual prejudice to make out a due process violation.  The violation of his rights is clear; he was compelled to stand trial in prison clothes and shackles when he was not a danger or threat to the court. The record does not demonstrate that the shackling and prison clothing error did not contribute to the verdict obtained. Nevertheless, the Florida State Courts have ignored Federal case precedent; his habeas petition should therefore be granted based on this violation of his fundamental rights.

## II.  PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN DEFENSE COUNSEL FAILED TO OBJECT TO HIS COURTROOM APPEARANCE AT THE BEGINNING OF HIS TRIAL.

Valle-Mejia's trial counsel failed to object the Petitioners court room appearance until the jury had already been tainted, preventing the petitioner from receiving a fair trial.  There are two prongs of an ineffective assistance claim that must be established by the petitioner, that his attorney's performance was deficient and that deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  In order to satisfy the deficiency element, the petitioner must illustrate that counsel's performance was below the standard of

9

reasonable professional assistance. Id. The United States Supreme Court has established that the prejudicial element of ineffective assistance of counsel is satisfied when the appellant shows that "there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceedings would have been different." Id 466 U.S. at 694, 104 S.Ct. 2052.

The petitioner was compelled to wear prison clothes and shackles during his trial because defense counsel failed to make a timely objection at the beginning of the proceedings.  During the trial, a witness identified Valle-Mejia as the person wearing a "jail uniform." (370 exhibit b). The jury was clearly aware of his status as a prisoner. After he was identified as the man in the jail uniform, trial counsel objected and admitted that his client had "begged for a shave" and did not get one.  He also stated that he had attempted to get him clothing and that the prison guards had stated Valle-Mejia would appear for trial in sweatpants and a shirt.  (see attached exhibit A).  The court informed him that Valle-Mejia would have been provided proper clothing if defense counsel brought it to the trial court's attention at the start of the proceedings.

On the third day of Valle-Mejia's trial, the court stated, "I see that your client is still in jail blues.  I assume this is because you did not wish to have him change this morning since they offered that possibility to you yesterday. (see attached exhibit B). Trial counsel stated:

> I did call at 7:58 this morning to Mr. Barett's (the Public Defender's] office and on his cell phone.  I didn't get any response.  Apparently, they were able to find or give him a sweatshirt today.  He's already been in his blues the last two days.  I don't see the difference at this point, but I did try to make an effort to get him clothing. Id.

This statement suggests that it was not trial counsel's intention to keep Valle-Mejia in prison clothes throughout the trial because he claimed to have made an attempt to find him appropriate clothes, but was unsuccessful. Additionally, trial counsel cannot offer a tactical reason for failing to object to the defendant's appearance at the beginning of the trial when he admitted to the court he had made an "effort" to find clothing but was unable to find proper attire. Trial counsel's performance was clearly deficient, resulting in the violation of Valle-Mejia's fundamental rights. If counsel had objected at the beginning of the trial, the court would have assisted him with finding suitable clothing.

There is a reasonably probability that the results of the proceedings would have been different but for this error. Valle-Mejia was marked as a criminal in the eyes of the jury before the trial began. He therefore received an unfair trial. He was not only wearing prison clothes, but was also wearing shackles. Both federal and Florida law provides that an accused has the right to appear before the jury free from physical restraints, including shackles or leg restraints. Bryant v. State, 785 So.2s 422, 428 (Fla. 2001); Illinois v. Allen, 397 U.S. 337, 334 (1970). An individual's presumption of innocence is adversely impacted when restrained in shackles in front of the jury. Id. The petitioner was not charged with violent crime and never exhibited dangerous behavior in the courtroom warranting the use of shackles. Counsel's failure to object to the shackles and his appearance in prison clothes was a fundamental error. Valle-Mejia was prejudiced by counsel's deficient performance, and there is a reasonable probability that he would have been acquitted if he had appeared before the jury in proper attire and free from shackles.

11

## III. THE PETITONER WAS DENIED ACCESS TO THE COURT SYSTEM WHEN HIS POST-CONVICTION MOTION WAS PER CURIAM AFFIRMED WITHOUT OPINION WHICH CONFLICTED WITH EXISTING STATE AND FEDERAL LAW.

"The right of access to the courts is founded in the Due Process Clause and assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of constitutional rights." Mitchum v. Purvis, 650 F.2d 647, 648 (5th Cir. 1981) citing Wolff v. McDonnell, 418 U.S. 539, 579, 94 S.Ct. 2963, 2986, 41 L.Ed.2d 935 (1974). When the petitioner's appeal was denied by the Fifth District Court, he was prevented from seeking further review by the Florida Supreme Court. The court offered no explanation for the affirmance, despite the fact that the holding was contrary to established Federal and State law. Additionally, the Florida Supreme Court has adopted Florida Appellate Procedure Rule 9.330(a) which allows a litigant to request that a district court of appeal issue an opinion in a case where that court has affirmed a case without an opinion to serve as a basis for Supreme Court review by filing a motion for rehearing. The Petitioner filed a motion for rehearing which was denied without an opinion.

It is well established beyond doubt that prisoners have a constitutional right of access to the courts. Bounds v. Smith, 430 U.S. 817, 822, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). "Access to the courts is clearly a constitutional right, grounded in the First Amendment, the Article IV Privileges and Immunities Clause, the Fifth Amendment, and/or the Fourteenth Amendment." Chappelle v. Rich, 340 F.3d 1279, 1282 (11th Cir. 2003) Christopher v. Harbury, 536 U.S. 403 415 n. 12, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002); see also Bank of Jackson County v. Cherry, 980 F.2d 1362, 1370 (11th Cir.

1993), holding the right of access to courts is grounded in the First Amendment. "To pass constitutional muster, access to the courts must be more than merely formal; it must also be adequate, effective, and meaningful." Id.; Ryland v. Shapiro, 708 F.2d 967, 972 (5th Cir. 1983); citing Bounds, 430 U.S. at 822, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977).

In Florida, courts have routinely held that a valid claim of ineffective assistance of counsel exists when trial counsel fails to object to a defendant wearing identifiable jailhouse clothing before the jury. See Lewis v. State, 864 So.2d 1211, 1212 (Fla. 4th DCA 2004); citing Palmer v. State, 831 So.2d 725 (Fla. 4th DCA 2002); Pineda v. State, 805 So.2d 116 (Fla. 4th DCA 2002); Waters v. State, 779 So.2d 625 (Fla. 1st DCA 2001). The Fifth District Court of Appeal in Florida had an obligation to either follow the law or explain why they have reached a different conclusion when there is a strong precedent for reversal. Valle-Mejia was therefore denied his constitutional right of access to the courts when his recent appeal was per curiam affirmed without opinion. The denial was not "adequate, effective and meaningful" to pass constitutional muster because the Fifth District Court of Appeal failed to disclose any reason for the denial. Valle-Mejia's petition should be granted.

## IV. THE PETITIONER RECEIVED INEFFECTIVE ASSISTANCE WHEN TRIAL COUNSEL FAILED TO INVESTIGATE AND CALL EXCULPATORY WITNESSES AT TRIAL.

The Petitioner's Sixth Amendment right to effective counsel was violated when trial counsel failed to call two defense witnesses, Special Agent Vastine and a confidential informant known as Kenny. To establish a claim of ineffective assistance of

13

counsel, petitioner must show that his counsel's performance fell below an objective standard of reasonableness and that the deficient performance prejudiced his case (i.e. but for his counsel's errors, the proceeding would have been different.) Strickland, 466 U.S. at 687-688. While decisions as to what evidence to present and what witnesses to call are generally presumed to be a matter of trial strategy, the failure to call witnesses or present other evidence may constitute ineffective assistance of counsel when it deprives a defendant of a substantial defense. Hutchinson v. Bell, 303 F.3d 720, 749 (6th Cir. 2002). Additionally, even when making strategic decisions, counsel's conduct must be reasonable. Roe v. Flores-Ortega, 528 U.S. 470, 481 (2000); Wiggins v. Smith, 539 U.S. 510, 522 (2003).

In the present case, the petitioner's fundamental constitutional rights were violated when trial counsel failed to investigate and call as witnesses Agent Vastine and the confidential informant known as Kenny. Special Agent Vastine was investigating the heroin trafficking of Juan Sanchez in Dade and Broward County. Sanchez was the key witness against the Petitioner and testified that Valle-Mejia was his only supplier of heroin. (see attached exhibit C and D). There were no fingerprints or any other physical evidence linking the Petitioner to the heroin at issue, only the testimony of Sanchez. Additionally, Sanchez, not the Petitioner, was named by the other witnesses at trial to be the seller of heroin. It was Sanchez who sold heroin to the confidential informant, not Valle-Mejia, and the heroin was found in Sanchez's house.

According to an investigative report of the Florida department of Law Enforcement, Vastine indicated that Sanchez was associated with a group of Puerto Rican males who were involved in heroin trafficking and that Sanchez's supplier of

14

heroin may have been one of these Puerto Rican mates, Juan Carlos Claudio. (*see* attached Exhibit F). Vastine would have testified that Sanchez was receiving his heroin from Claudio, not Valle-Mejia. The defense at trial was that the defendant did not sell or supply heroin, and that the heroin found in Sanchez's home belonged to Sanchez, not the Petitioner. Vastine never mentioned Valle-Mejia. This testimony would dispute the allegations made at trial by Juan Sanchez that Valle-Mejia was his only supplier of heroin and that he did not know Juan Carlos Claudio. (*see* attached exhibit C and D).

There is a reasonable probability that the outcome of the trial would have been different because Vastine's testimony would have impeached Sanchez's credibility. Vastine could have explained to the jury that he had been investigating Sanchez since 2002, and that Sanchez's supplier of heroin was Claudio and not Valle-Mejia. Vastine would not be difficult to locate because he is a Special Agent in South Florida. He was central to the investigation in this case because he was involved in the investigation of Juan Sanchez, who was the only person linking the Petitioner to criminal activity. He would have been able to testify because he was living and working in South Florida at the time and was in contact with other officers who did testify at the trial.

The second potential witness was the confidential informant known as Kenny, who performed several controlled buys of heroin on behalf of law enforcement from Sanchez. Kenny had known Sanchez for over a year and owed him money for previous heroin purchases. (*see* attached exhibit G). Kenny purchased heroin from Sanchez on the day that Valle-Mejia and Sanchez were arrested. He would have testified that he had seen the heroin and the Nike shoebox containing the heroin around 12:30 on the day the warrant was executed, long before Valle-Mejia ever arrived at the home. The

search warrant was executed around 6:00 pm, and the heroin found was in the same shape and form Kenny had described earlier in the day. His testimony would prove that Sanchez, not the Petitioner, was in possession of the heroin and the sole owner of it. Valle-Mejia was convicted of trafficking in Heroin, as opposed to conspiracy to traffic in heroin. Kenny's testimony would have provided a substantial defense to this charge, by informing the jury he saw the shoe box containing heroin long before the petitioner ever arrived at the home, it would prove that Valle-Mejia did not have possession over the heroin.

Kenny could confirm that Sanchez was selling heroin for at least a year, discrediting Sanchez's testimony that he had only been selling heroin for a couple months at the Petitioner's direction. Sanchez always referred to the heroin as his heroin when dealing with Kenny as well. Therefore, the failure to call Kenny as a defense witness at trial prejudiced the outcome of the trial because Kenny would have confirmed that Sanchez was trafficking heroin for over a year, and was receiving heroin from other sources and not the Petitioner. He was available to testify at trial because he told two agents he was willing to testify in court and was listed as a possible witness for the State. Like Vastine, this confidential informant would have shown the jury that Sanchez's testimony was unreliable. Valle-Mejia's Sixth Amendment right to effective counsel was violated by this error and for the foregoing reasons, his petition should be granted.

## CONCLUSION

Based upon the foregoing arguments and authorities, the Petitioner respectfully requests that this Court grant his writ of habeas corpus pursuant to 28 U.S.C. § 2254.

Respectfully submitted,

The Law Offices of Hugo Rodriguez, P.A.
1210 Washington Avenue
Suite #245
Miami Beach, Fl 33139
(305) 373-1200
(305) 532-5560
hugolaw@aol.com

By:_____
Hugo A. Rodriguez, Esq.
Florida Bar # 0312150
Nicole N. Mace
Florida Bar # 0017415

1    HER?

2        A    FOUR OR FIVE TIMES A WEEK.

3        Q    SO WOULD IT BE FAIR TO SAY SHE WAS A

4    FRIEND OF YOURS?

5        A    YES.

6        Q    WAS SHE ALSO A FRIEND OF YOUR MOTHER'S?

7        A    YES.

8        Q    WAS SHE EVER OVER TO YOUR HOUSE?

9        A    YES.

10       Q    DO YOU KNOW AN INDIVIDUAL NAMED LEO DEL

11   VALLE-MEJIA?

12       A    YES.

13       Q    DO YOU SEE HIM IN THE COURTROOM HERE

14   TODAY?

15       A    YES.

16       Q    WOULD YOU PLEASE POINT TO HIM AND

17   IDENTIFY HIM BY AN ARTICLE OF CLOTHING THAT HE'S

18   WEARING?

19       A    HE'S SEATED IN FRONT OF ME WITH THE JAIL

20   UNIFORM.

21            MR. FINKBEINER:  YOUR HONOR, MAY THE RECORD --

22            MR. SELTZER:  JUDGE, I'M GOING TO OBJECT.

             THE COURT:  DO YOU WANT TO APPROACH?

             MR. SELTZER:  YES.



*FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH):*

1          THE COURT:  YOUR OBJECTION, COUNSEL?

2          MR. SELTZER:  THAT'S ENTIRELY IMPROPER.

3          THE COURT:  WOULD YOU REQUEST A CURATIVE

4     INSTRUCTION?

5          MR. SELTZER:  EITHER THAT OR --

6          THE COURT:  COUNSEL, YOUR CLIENT DECIDED TO WEAR

7     THE JAIL UNIFORM, EVEN THOUGH WE GAVE HIM THE OPTION TO

8     WEAR REGULAR CLOTHES.  EVEN THOUGH WE TOLD HIM IT WAS

9     GOING TO BE RIGHT OUT HE WAS --

10         MR. SELTZER:  HE HAD BEGGED TO GET A SHAVE

11    YESTERDAY.  HE DIDN'T GET A SHAVE.

12         THE COURT:  NOBODY BROUGHT IT TO MY ATTENTION HE

13    WAS NOT IN THE CLOTHES HE WANTED TO BE IN.

14         MR. SELTZER:  BRINGING THAT ISSUE UP, WHEN I

15    REPEATEDLY DID IT YESTERDAY WITH THE GUARDS, I ASKED THE

16    GUARDS EVEN LAST NIGHT, HOW DO I GET HIM A SHAVE?  WE

17    DON'T KNOW ANYTHING ABOUT THIS.  CALL THE JAIL.  I

18    UNDERSTAND.  I ASKED ABOUT THE CLOTHES.  THEY SAID NO

19    PROBLEM, HE'LL BE IN SWEAT PANTS AND A SHIRT.

20         THE COURT:  IF YOU HAD BROUGHT IT TO MY ATTENTION I

21    COULD HAVE HELPED YOU.  THEY HAVE CLOTHES AT THE PUBLIC

22    DEFENDER'S OFFICE.

23         MR. SELTZER:  I CERTAINLY WOULD LIKE A CURATIVE

24    INSTRUCTION.

25         THE COURT:  WHAT WOULD YOU LIKE ME TO TELL THEM?

1          MR. SELTZER:  THAT THE JURY IS TO DISREGARD THAT

2     COMMENT.

3          THE COURT:  I WILL SO INSTRUCT THEM.

4     *(THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT)*

5          THE COURT:  THE OBJECTION WILL BE SUSTAINED.  THE

6     JURY IS TO DISREGARD THAT COMMENT.  YOU MAY CONTINUE.

7          MR. FINKBEINER:  MAY THE RECORD REFLECT THAT THE

8     WITNESS HAS IDENTIFIED THE DEFENDANT.

9          THE COURT:  IT WILL.

10     Q    DO YOU RECALL THE FIRST TIME YOU MET

11     THIS INDIVIDUAL NAMED LEO?

12     A    YES.

13     Q    AND WHEN WAS THAT?

14     A    APPROXIMATELY THE END OF 2002 AT A CLUB.

15     Q    AND WHAT WAS THE NAME OF THAT CLUB?

16     A    CARRIBEAN BEACH CLUB.

17     Q    HOW WAS IT THAT YOU MET HIM, OR IN OTHER

18     WORDS, WHO INTRODUCED YOU TO LEO?

19     A    I ARRIVED AT NIGHT TO PICK UP MY MOTHER

20     THERE AND HE WAS -- MY MOTHER HAD ALREADY MET HIM

21     AND HE WAS THERE IN THE GROUP OF PEOPLE THAT WERE

22     WITH MY MOM AND SOMEONE ELSE, AND THAT'S HOW I MET

23     HIM.

24     Q    WAS LINDA AT THE CLUB THAT NIGHT?

25     A    YES.

1    THE COURT:  MR. SELTZER, WE NEED TO PUT

2    SOMETHING ON THE RECORD.  I SEE THAT YOUR

3    CLIENT IS IN JAIL BLUES.  I ASSUME THAT IS

4    BECAUSE YOU DID NOT WISH TO HAVE HIM CHANGE

5    THIS MORNING SINCE THEY OFFERED THAT

6    POSSIBILITY TO YOU YESTERDAY.

7    MR. SELTZER:  I TRIED TO EFFECTUATE THAT

8    AGAIN THIS MORNING.  I DID CALL AT 7:58 THIS

9    MORNING TO MR. BARRETT'S OFFICE AND ON HIS CELL

10    PHONE.  I DIDN'T GET ANY RESPONSE.  APPARENTLY,

11    THEY WERE ABLE TO FIND OR GIVE HIM A SWEATSHIRT

12    TODAY.  HE'S ALREADY BEEN IN HIS BLUES THE LAST

13    TWO DAYS.  I DON'T SEE THE DIFFERENCE AT THIS

14    POINT, BUT I DID TRY TO MAKE AN EFFORT TO GET

15    HIM CLOTHES.

16    THE COURT:  ALL RIGHT.  SO YOU HAVE NO

17    OBJECTION TO HOW HE'S DRESSED?

18    MR. SELTZER:  NOT AT THIS POINT IN THE

19    PROCEEDINGS.

20    THE COURT:  ALL RIGHT.  THANK YOU.  WE'LL

21    BE IN RECESS UNTIL TWO MINUTES BEFORE 11.

22                    -      -      -

23                (WHEREUPON, A SHORT RECESS WAS TAKEN.)

                         -      -      -

              (THE FOLLOWING PROCEEDINGS WERE HAD IN

EXHIBIT

B

1        Q      HOW WAS THAT?

2        A      BY KENNY.

3        Q      NOW, WHO IS KENNY?   TELL THE JURY.

4        A      IT'S A C.I.

5        Q      WHAT'S A C.I.?

6        A      THAT'S A CONFIDENTIAL INFORMANT.

7        Q      OBVIOUSLY, WHEN YOU WERE SELLING TO HIM,

8   DID YOU KNOW THAT?

9        A      NO.

10       Q      HOW OFTEN WOULD YOU SAY YOU SOLD TO

11   KENNY?

12       A      A COUPLE OF TIMES.

13       Q      WHO WAS THE SUPPLIER OF THAT HEROIN?

14       A      LEO.

15       Q      DID YOU HAVE ANY OTHER SUPPLIERS OF

16   HEROIN?

17       A      NO.

18       Q      DO YOU EVER USE HEROIN?

19       A      NO.

20       Q      OKAY.   I WANT TO BRING YOUR ATTENTION TO

21   APRIL 15TH AND APRIL 16TH, 2003.   IF YOU CAN,

22   PLEASE DESCRIBE FOR THE JURY THE ARRANGEMENT YOU

23   AND LEO HAD ON THOSE DATES.

         A      ON THE 15TH, ME AND LEO HAD ARRANGEMENTS

     TO SELL 700 GRAMS TO THE C.I. KENNY.

EXHIBIT
C

1       Q       PHOTOGRAPHIC MEMORY MEANS YOU CAN

2    REMEMBER EVERYTHING YOU SEE.

3       A       OKAY.

4       Q       SO CAN YOU REMEMBER EVERYTHING YOU SEE?

5       A       NO.

6       Q       DID YOU MEMORIZE THIS DOCUMENT?

7       A       NO.

8       Q       WERE YOU DEALING IN HEROIN?

9       A       HUH?

10      Q       WERE YOU DEALING HEROIN?

11      A       YES.

12      Q       DID YOU DEAL HEROIN TO DIFFERENT PEOPLE

13   IN THE STREETS OF ORLANDO?

14      A       YES.

15      Q       WHO PROVIDED YOU WITH THAT HEROIN?

16      A       LEO.

17      Q       LEO.   DID YOU HAVE ANY OTHER PROVIDER OF

18   HEROIN?

19      A       NO.

20      Q       DID YOU SELL HEROIN TO KENNY?

21      A       YES.

22      Q       ON MORE THAN ONE OCCASION?

         A       YES.

         Q       IN EVIDENCE ARE THE LEDGERS THAT YOU

25   TALKED ABOUT YOUR DRUG TRANSACTIONS, CORRECT?

EXHIBIT
D

1   OR EVEN IF YOU DID SEE HIM, THEN YOU SEE HIM ONCE

2   IN JANUARY OF 2002 AND THEN AGAIN IN DECEMBER OF

3   2002 YOU SEE HIM AT MIRIAM'S HOUSE, AND OUT OF THE

4   BLUE HE COMES UP AND WANTS YOU TO BECOME A MAJOR

5   DISTRIBUTOR OF HEROIN IN ORLANDO.  THAT'S YOUR

6   TESTIMONY HERE?

7        A    YES.

8        Q    AND IT WAS YOUR TESTIMONY HERE TODAY

9   THAT LEO WAS YOUR ONLY SUPPLIER?

10       A    YES.

11       Q    DID YOU DEAL WITH SOMEBODY BY THE NAME

12  OF CLAUDIO IN MIAMI?

13       A    NO.

14            MS. WEDGE-MCMILLEN:  OBJECTION.  OUTSIDE THE SCOPE

15       OF DIRECT.

16            THE COURT:  SUSTAINED.

17       A    NO.

18       Q    DID YOU HAVE A SUPPLIER BY THE NAME OF

19  TARTUGA (PHONETIC)

20            MS. WEDGE-MCMILLEN:  OBJECTION.

21            THE COURT:  SUSTAINED.

22            MR. SELTZER:  JUDGE, CAN I HAVE A SIDEBAR?

23            THE COURT:  YES, YOU MAY.

24  *(THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH):*

25            MR. SELTZER:  SHE SPECIFICALLY ASKED HIM WHETHER

1    LEO WAS HIS MAIN SUPPLIER.  THAT'S WITHIN THE SCOPE OF

2    QUESTIONING.

3         THE COURT:  YOUR RESPONSE?

4         MS. WEDGE-MCMILLEN:  THAT WAS ASKED IN THE ORIGINAL

5    DIRECT EXAMINATION, AND HE WAS CROSS-EXAMINED ON THAT

6    POINT.

7         MR. SELTZER:  YOU ALSO ASKED IT IN REDIRECT.

8         MS. WEDGE-MCMILLEN:  RIGHT.  I DON'T KNOW WHO HE'S

9    REFERRING TO, AND I DON'T KNOW WHO ANY OF THESE PEOPLE

10   ARE.

11        MR. SELTZER:  IT'S IN THE INVESTIGATIVE REPORTS

12   THAT HE WAS A TARGET IN AN INVESTIGATION BY HAVING A --

13        MS. WEDGE-MCMILLEN:  THAT WAS LEO'S SUPPLIER.

14   THAT'S WHAT WAS IN THE REPORTS.

15        MR. SELTZER:  NO, IT SAYS JUAN SANCHEZ WAS A TARGET

16   OF AN INVESTIGATION OF A BUNCH OF PUERTO RICANS WHEN A

17   MAN BY THE NAME OF JUAN SOMETHING CLAUDIO WAS THE LEADER

18   OF THE PUERTO RICAN HEROIN GANG.  HE WAS SUSPECTED OF

19   BEING ONE OF THE DISTRIBUTORS.

20        THE COURT:  I WILL OVERRULE THE OBJECTION.

21   *(THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT)*

22        THE COURT:  THE OBJECTION IS OVERRULED.

23        MR. SELTZER:  THANK YOU.

24   Q    SO MY QUESTION IS, DID YOU HAVE A

25   SUPPLIER BY THE NAME OF CLAUDIO IN MIAMI?

1        A     NO.

2        Q     DID YOU HAVE A SUPPLIER BY THE NAME OF

3   TARTYGA? (PHONETIC SPELLING)

4        A     NO.

5        Q     NOW, WHEN THE GOVERNMENT JUST ASKED YOU

6   ABOUT YOUR SENTENCE, AND THIS 20 YEARS OR 17

7   YEARS, YOU'VE HAD DISCUSSIONS WITH BOTH

8   MR. GILLESPIE AND YOUR ATTORNEY ABOUT GAIN TIME

9   AND GOOD TIME, HAVE YOU NOT?

10       A     NO.

11       Q     NOBODY EVER TOLD YOU THAT YOUR 25-YEAR

12   SENTENCE, YOU WOULD SERVE EVERY SINGLE DAY IN

13   JAIL?

14       A     YEAH.

15       Q     BUT YOUR 20-YEAR SENTENCE, YOU WOULDN'T

16   BE REQUIRED TO SERVE THE WHOLE 20?

17       A     NO.

18       Q     WHAT?  YOU DIDN'T KNOW ABOUT THAT?

19       A     NO, I DIDN'T KNOW ABOUT THE GAIN TIME.

20       Q     SO YOU'RE HEARING ABOUT THAT FOR THE

21   FIRST TIME TODAY?

22       A     YEAH.  I THOUGHT I HAD TO DO THE DAY FOR

23   DAY, THE 20 YEARS.

24       Q     WHEN -- WERE YOU TOLD BY MR. GILLESPIE

25   THAT HIS RECOMMENDATION TO THE COURT WOULD CARRY

IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT, IN AND
FOR ORANGE COUNTY, FLORIDA

CASE NO. 2003-CF-4684
DIVISION 19

STATE OF FLORIDA,
    Plaintiff,

vs.

LEONARDO DEL VALLE-MEJIA,
    Defendant.
_____/

## ORDER DENYING MOTION FOR POSTCONVICTION RELIEF

This matter came before the Court for consideration of Defendant Leonardo Del

Valle-Mejia's Motion for Postconviction Relief, filed August 31, 2006, pursuant to

Florida Rule of Criminal Procedure 3.850. After reviewing the Motion, file, and record,

together with the State's Response, filed February 26, 2007, the Court concludes that

summary denial is warranted.

Procedural History: On April 2, 2004, Defendant was convicted of trafficking in

heroin, 28 grams or more. He was acquitted of conspiracy to traffic in heroin, 28 grams

or more, and tampering with physical evidence. On May 25, 2004, he entered pleas of

guilty to additional charges:  fraudulent use of personal identification information

(identity theft) and possession of unauthorized driver's license. He was sentenced for all

three offenses on the latter date to 30 years in the Department of Corrections for the

trafficking conviction, subject to a 25-year minimum mandatory, and time served in the

Orange County Jail for the other offenses. The Fifth District Court of Appeal per curiam



affirmed; *Del Valle-Mejia v. State*, 895 So. 2d 1084 (table) (Fla. 5th DCA 2005).

In the instant Motion, Defendant alleges that he received ineffective assistance of counsel. To warrant an evidentiary hearing, he must allege facts sufficient to establish a prima facie case under the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668 (1984) (deficient performance and resulting prejudice).

Argument I: Defendant alleges counsel failed to object to his presence in front of the jury in identifiable prison clothes. He argues that he was never asked if he was satisfied wearing jailhouse clothing and that the record does not reflect he knowingly waived his right to appear in non-prison clothing.

The Court is not persuaded by the State's Response that counsel's strategy was apparent from the face of the record. Counsel did announce his intention to point out that a co-defendant had his bail reduced from $500,000 to $10,000 whereas Defendant was unable to reduce his own $500,000 bail, which would seem to indicate counsel's attempt to impeach the witness with bias. However, it is rarely appropriate to make a finding of trial strategy without an evidentiary hearing.

Nevertheless, the Court concludes it is not necessary to reach a conclusion regarding counsel's strategy, because Defendant cannot establish that he was prejudiced by standing trial in jail clothing. He cannot make a persuasive argument that his guilt was presumed as a result of the uniform, because he was actually acquitted of two of the counts with which he was charged at trial.

2

Argument II: Defendant alleges counsel failed to object during the prosecutor's improper closing argument, which appealed to racial prejudice. He argues the prosecutor told the jury he was "100 percent Columbian," implying that because Columbia is a known exporter of narcotics, Defendant must be guilty of trafficking in heroin.

As the primary basis for denying relief, the Court finds that this claim is refuted by the record, which demonstrates that counsel did object to the prosecutor's comments. *See* trial transcript, page 812.

Furthermore, although the State does not dispute the holdings in the cases on which Defendant relies for support, it argues the prosecutor's statements are taken out of context. This Court agrees. *See* the following excerpt from the closing argument, transcript pages 743-744:

> Now it's possible, I suppose, that Leo Del Valle-Mejia is the unluckiest man in Orange County. That is possible, I suppose, because that's what you have to believe. You have to believe that he is monumentally unlucky. He happens to be friends with the wrong person, [co-defendant] Juan Sanchez. He is accidentally alone in a house with about 200 grams of heroin on the day the search warrant is executed. He's also got the terrible luck to not only be alone in a house with all of this heroin set out on the counter, being prepared to be sold and distributed, but he is unlucky enough to be in a house with a leaky toilet. A runny leaky toilet. He's accidentally running towards the spare bathroom 10 feet away when the officers are coming through the door. He happens to be in a picture with [co-defendant] Maria Burgos-Rivera. Bad luck again. Bad choice to have that picture taken with her. He happens to be from Miami. That's a shame. He happens to have a cell phone with a 305 and 786 area code number. And he happens to be 100 percent Columbian. Bad, bad luck for Leo.

The prosecutor does not appear to be arguing Defendant must be guilty merely because he was Columbian; she was merely pointing out a number of circumstances

3

relating to his connection to the crime. Among other things, co-defendant Maria Burgos-Rivera had described a tattoo on Defendant's back that said "Columbia," and the prosecution tried to establish a connection between Defendant and Burgos-Rivera in order to prove a conspiracy. *See* trial transcript, page 603-604. Significantly, this attempt failed, as Defendant was acquitted of the conspiracy charge.

Prosecutors are allowed wide latitude in closing arguments, and this Court concludes there is no reasonable probability that the outcome of the trial or the appeal would have been different if counsel had objected further than he already did.

Argument III: Defendant alleges counsel failed to investigate and call exculpatory witnesses at trial: Special agent Chris Vastine and a confidential informant known as Kenny. He argues that Vastine was investigating the trafficking of co-defendant Juan Sanchez in Dade and Broward Counties and would have testified that Sanchez had other suppliers besides Defendant and was probably receiving heroin from an individual named Juan Carlos Claudio rather than Defendant. This would have impeached Sanchez' testimony that Defendant was his only supplier and that he did not know Claudio. He further argues that Kenny would have testified that he had known Sanchez for more than a year, was selling heroin throughout 2002 before he allegedly entered an agreement with Defendant, and received his supply from other sources. This would have impeached Sanchez's testimony that he had only been selling heroin for a few months at Defendant's direction.

4

Vastine's report indicated that Claudio "possibly may be" Claudio. The Court agrees with the State that there is no reason to conclude that Vastine's testimony would have been as strong an impeachment as Defendant would like to believe. There is no reasonable probability that fact Sanchez "possibly" had another supplier would have exonerated Defendant of guilt in the trafficking charge or that impeachment of Sanchez on this point would have led the jury to discredit his testimony. The Court reaches a similar conclusion with respect to Kenny's testimony, finding that it would also have amounted to impeachment on a minor issue and would not have led the jury to discredit Sanchez's testimony.

Finally, the Court agrees with the State that the following exchange between the trial court and Defendant was significant:

| | |
|---|---|
| The Court: | Mr. Mejia, you have been represented by Mr. Seltzer in this case. Have you been satisfied with his representation of you? |
| The Defendant: | Yes, Your Honor. |
| The Court: | Has he done everything that you've asked him to do? |
| The Defendant: | Yes, Your Honor. |
| The Court: | Has he done anything that you asked him not to do? |
| The Defendant: | No, Your Honor. |
| The Court: | Did he call all of the witnesses you wanted called? |
| The Defendant: | I didn't call for any witness, Your Honor. |

Defendant is bound by this statement he made under oath. *Henry v. State*, 920 So. 2d 1245, 1246 (Fla. 5th DCA 2006).

Based on the foregoing, it is ORDERED AND ADJUDGED:

1. The Motion for Postconviction Relief is DENIED.

2. The State's Response, together with all record attachments, is incorporated into this Order by reference.

3. Defendant is advised that he may file an appeal in writing within 30 days of the date of rendition of this Order.

4. The Clerk of Court shall promptly serve a copy of this order upon Defendant including an appropriate certificate of service.

DONE AND ORDERED in chambers at Orlando, Orange County, Florida, this _____ day of November 2007.

_____
TIM SHEA
Circuit Court Judge

### Certificate of Service

I certify that a copy of the foregoing Order Denying Motion for Postconviction Relief has been provided this _____ day November 2007, to Russell W. Mace III, Esquire, The Law Offices of Russell Mace, P.A., 1210 Washington Avenue, Suite 220, Miami Beach, Florida 33139; and to Robert C. Finkbeiner, Assistant Statewide Prosecutor, 135 West Central Boulevard, Suite 1000, Orlando, Florida 32801.

_____
Judicial Assistant

6

# FLORIDA DEPARTMENT OF LAW ENFORCEMENT
## INVESTIGATIVE REPORT

This Investigative Report is in reference to an ongoing investigation into the heroin trafficking of Juan Felipe Sanchez.

Circa July 2002, MBI Agt. Joe Espanol was contacted by a Confidential Source (hereafter referred to as a CS) regarding the drug trafficking activities of SANCHEZ. The CS stated that he knew SANCHEZ was trafficking in large quantities of heroin within the Central Florida area. The CS added that he had known SANCHEZ for about one year and had done "business" with him in the past. The CS informed Agt. Espanol that SANCHEZ invited him/her to his house and the CS accepted. The CS said that he/she went to SANCHEZ' residence and SANCHEZ began to brag about the amount of heroin he was "moving." The CS said that SANCHEZ showed him about 800 grams of heroin that SANCHEZ told him had just obtained from someone in Miami, Florida. The CS then exchanged telephone numbers with SANCHEZ since SANCHEZ was willing to supply the CS with heroin. SANCHEZ told the CS that he would sell the CS each gram of heroin between $70.00 and $90.00 dollars. The CS then contacted Agt. Espanol and provided him with the above information.

Agt. Espanol then contacted FDLE SA Francisco Hidalgo and requested assistance with the investigation. Agt. Espanol and SA Hidalgo then agreed to contact TFO Danny Warren of the DEA HIDTA group and advised him of the situation. The agents then agreed to attempt to purchase 100 grams of heroin from SANCHEZ with the assistance of the CS.

SA Francisco Hidalgo conducted some initial research and discovered that SANCHEZ had been an FDLE target in an investigation in the Dade/Broward county area. SA Hidalgo contacted SA Chris Vastine via electronic mail in an attempt to obtain information regarding SANCHEZ. SA Vastine indicated that SANCHEZ belonged to a group of Puerto Rican males who came from the same town in Puerto Rico. According to SA Vastine, SANCHEZ' heroin supplier possibly may be a Puerto Rican male from the Dade/Broward county area named Juan Carlos CLAUDIO, a.k.a. Tortuga. SA Vastine added that CLAUDIO owned a body shop, which was suspected of installing hidden compartments on

| Case Number: OR-18-0120 | Serial #:1 |
|---|---|
| Author : Hidalgo, Francisco Armando | Office: Orlando |
| Activity Start Date: Feb 05, 2003 | Activity End Date: Feb 05, 2003 |
| Approved By: Bisland,John | |
| Description: | |

Initial Debriefing of MBI Confidential Source

THIS REPORT IS INTENDED ONLY FOR THE USE OF THE AGENCY TO WHICH IT WAS DISSEMINATED AND MAY CONTAIN INFORMATION THAT IS EITHER PRIVILEGED OR CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. ITS CONTENTS ARE NOT TO BE DISTRIBUTED OUTSIDE YOUR AGENCY



EXHIBIT
F

1776200312091514 45

automobiles. SA Vastine added that CLAUDIO may be associated with an individual from the same area named Carlos Manuel BORGES, a.k.a. Monkey.

The CS was then instructed by Agt. Espanol to contact SANCHEZ and to place an order for 100 grams of heroin.  Subsequently, the CS contacted SANCHEZ and placed an order for 100 grams of heroin.  SANCHEZ told the CS that he had just sold all of the heroin and did not have any.  SANCHEZ informed the CS that he was going to make a trip to Miami, Florida to obtain more heroin and would contact the CS upon returning.  The CS informed the agents that SANCHEZ never contacted him.

The CS stated that around August 2002 he/she contacted SANCHEZ telephonically and asked him why SANCHEZ had not contacted the CS. SANCHEZ informed the CS that he had left the Orlando, Florida area and had gone to the Boston, Massachusetts area.  SANCHEZ added that one of his brothers had been arrested there for trafficking in drugs.  The CS and SANCHEZ agreed to do "business" in the near future.

The CS was again instructed to contact SANCHEZ and place an order of heroin between 50 and 100 grams.  The CS stated that he/she attempted several times to communicate with SANCHEZ but was unsuccessful.  The CS felt that SANCHEZ was avoiding him but the CS couldn't figure out why.

On January 27, 2002 Agt. Espanol stated that the CS contacted him.  Agt. Espanol said that the CS informed him that the CS had spoken with SANCHEZ a couple of days ago.  The CS stated that he confronted SANCHEZ and asked him why he had been avoiding him/her.  SANCHEZ told the CS that the reason SANCHEZ had avoided him/her was because the CS owed him around $1,600.00 dollars due to a one-year old drug debt.  The CS told SANCHEZ that he/she had forgotten about it but was willing to pay him back.  SANCHEZ agreed to sell heroin to the CS only if the CS pay the debt.  The CS informed Agt. Espanol that he had negotiated the debt down to $650.00 dollars.

Agt. Espanol instructed the CS to contact SANCHEZ and place an order for 2 ounces of heroin to be purchased tomorrow.  The CS contacted SANCHEZ and placed an order for 2 ounces of heroin at $90.00 dollars per gram.

Agent Joseph Español instructed the CI to order 500 grams of heroin from **Juan Sanchez**. The CI telephoned **Juan Sanchez** and ordered the 500 grams of heroin. **Juan Sanchez** asked the CI at approximately what time the CI would be over to make the purchase. The CI told **Juan Sanchez** that the CI would be at the residence of **Juan Sanchez** at approximately 3:00 PM.

On April 16, 2003, the CI placed a telephone call to Agent Joseph Español and told Agent Joseph Español that on April 16, 2003 at approximately 1230 hours that the CI had gone to the residence of **Juan Sanchez** located at **6552 Viewpoint Court** in Orlando and observed approximately 150 grams of heroin inside a 1 gallon ziplock plastic bag that contained a large number of compressed "fingers" (street slang for a compressed finger shaped quantity of heroin weighing about 8 grams each) of heroin. The CI told Agent Joseph Español that each compressed finger of heroin contained approximately 8 grams of heroin. The plastic bag containing the heroin was inside a NIKE shoebox (cardboard color) that was laying on a kitchen counter top next to the kitchen sink. The CI also had observed approximately ¼ ounce of marijuana and INOSITOL, a substance used to cut heroin to increase its volume.

The CI told Agent Joseph Español that the CI had asked **Juan Sanchez** if he had the previously ordered 500 grams of heroin. **Juan Sanchez** told the CI that he only had the 150 grams of heroin in the shoebox and approximately 50 grams of heroin at another location down the road. **Juan Sanchez** did not elaborate as to the exact location of the other 50 grams of heroin. **Juan Sanchez** told the CI that he wanted to sell each gram of heroin at a purchase price of $95.00 per gram because of the purity of the heroin.

The CI told **Juan Sanchez** that he would be purchasing the 200 grams of heroin at $95.00 per gram later that same day and **Juan Sanchez** agreed to hold the heroin. Later, on April 16, 2003, **Juan Sanchez** called the CI to confirm that the CI would be picking up the 200 grams of heroin that **Juan Sanchez** was holding for the CI.

At approximately 1315 hours, the CI met with Agents Joseph Español and Uriel Ortiz and wrote a sworn statement detailing the events described above and the CI stated that the CI was willing to testify in court.

The CI told Agents Joseph Español and Uriel Ortiz that **Juan Sanchez** resided at **6552 Viewpoint Court in Orlando, Orange County, Florida,** with his wife, **Nelva Janice Nazario,** and a 5 month old baby in a house that was a 1 story light peach colored stucco structure with a 1 car garage attached in the front of the house.

At approximately 1700 hours, Agents Joseph Español and Ray Schulte obtained a search warrant from Orange County Circuit Court Judge F. Lauten.

